I have four issues to talk about this morning, and I guess I'll start from the beginning and go to the end. The first argument concerns Brady claims. It's important, I think, in evaluating these claims to understand how absolutely crucial the testimony of John Abbott, the witness to whom the claims pertain, was to the government's case here. Abbott was the only person who claimed to have direct contact with Mr. Dado during the life of the marijuana growing operation, and to have knowledge of Mr. Dado's involvement, direct personal knowledge of his involvement as a supposed investor, which was the government's theory of his participation in that operation. As to all the other participants who said they had heard his name, it was all co-conspirator hearsay. I'm not saying it wasn't admissible, but it certainly didn't have the same force or effect as the testimony from Mr. Dado's alleged or avowed best friend that he had direct contact with Mr. Dado and to whom, and he claimed that Mr. Dado revealed his involvement to him. There would have been a good reason for the intermediary, this fellow named Mike Zimites, who did not testify. There were three items. The trial judge agreed that two of these items were in fact Brady material and were concealed or were not revealed, but he didn't find them to be material. The third one he didn't find the existence of. This third one, which I think is perhaps the most important one, is that when Mr. Abbott was first interviewed by the people investigating the case that became this case, he gave information about another person whose name we have redacted here. It's not Mr. Dado, it's a third person. He specifically told the investigators that this other person, whom he described as a crooked cop, had burned his own home, submitted an insurance claim, and used the funds that he had collected to help partially fund this grow operation, invested it in the marijuana operation. He then told another investigator, Mr. Abbott was at that time being investigated by state officials for his own separate marijuana related activities. He told the state investigator that the federal agent who had questioned him about this crooked cop had promised him immunity, which was not true. I'm sorry. I was listening to the first argument and I feel like I'm a victim of age discrimination, but unfortunately it's my musculoskeletal system which is attacking me. It didn't do it until I got old. The third item was that Mr. Abbott's motivation for cooperation was to avoid federal prosecution, as opposed to the state prosecution for a small marijuana transaction two or three years prior. As I said, Judge Ludington found that the second two were Brady materials, should have been disclosed, but didn't find the material. I think if you look at the cross-examination of Mr. Abbott, it was very limited as to bias. The fact that he assiduously pursued federal immunity, that he lied to do it, would have changed the entire character of the bias inquiry. I just don't think that... It could be used for credibility. Yes, sir. That's your bottom line on this. Bias, credibility, I'm not sure how those two interact. I think credibility sounds more dismissive than bias, although they both probably mean the same thing. But there are different kinds of credibility, I suppose, too. Judge Ludington found that we didn't make out the elements of the first, the false accusation, the first Brady matter. But I don't see how you can fairly read the record that way. The investigating agent testified that he had contacted the state fire marshal in following up on the information given to him by Abbott. Under Michigan law, every fire department in the state is required to report every fire to the state fire marshal. The fire marshal found no fires associated with Mr. Abbott or with any of the addresses associated with Mr. Abbott. I'm not Mr. Abbott, but the person identified by Mr. Abbott, or much less the address given by Mr. Abbott. Well, if you don't have a fire, you can't have a fire insurance claim, which means you can't have money to put into a marijuana operation. I just don't see how it could have been anything but a false statement or certainly a sufficient basis to allow effective cross-examination on the issue. My time is dwindling and I want to skip to the sentencing issue, not because I don't think much of the others, but because I think the sentencing issue is perhaps legally the most interesting one. The jury in this case was instructed, in accordance with then existing circuit precedent, that Mr. Dado did not have to be shown to have known the drug quantity. In other words, the indictment in this case charged and the jury found that the marijuana growing operation involved 1,000 or more plants. Because the government had filed a Section 851 enhancement under Section 841B, down there on the bottom, Mr. Dado was subject to a mandatory minimum of 20 years. The jury was specifically and affirmatively instructed that although Mr. Dado had to find beyond a reasonable doubt that Mr. Dado knowingly associated himself with this operation, they did not have to find that he was aware of the scope of the operation. They did not have to find that he knew that this operation involved 1,000 kilograms or more or 1,000 marijuana plants. It could have been five plants and not 1,000, that's what you're saying. There was no instruction to the jury that he had to know that it was 1,000 or more plants. They were specifically told that he did not have to know, that the government did not have to prove it. The conspiracy did have to involve more than 1,000 plants. They did have to find that, right? They had to involve, yes, that's correct. Not the knowledge on the plant. That's correct. Section 841 is set up, Title 21 is structured much like Section 924 of Title 18. You have the first subparagraph, which in our case defines an offense or part of an offense as being a person knowingly manufactures, in our case. Isn't your argument here that once under that Allene case that the more, 1,000 or more plants has to be shown, once that has to be shown under the mandatory minimum problem and that becomes an element that, although the law was, when it was not an element, was to the contrary, that when it becomes an element you have to have a mens re. Well, yes, sir. Isn't that your argument? That is my argument. In other words, the Sixth Circuit law pre-Allene, specifically a case called United States against Gunter, which was written by Judge Clay and well thought out, carefully analyzed. I'm sorry. You get the point, I suppose. In any event, if I knew where the car was parked, I'd go wash it. In Gunter's specific... I don't understand why Allene should change this. So that's the key issue. Very simple. There are two sections to 841. Subsection A reads anyone who knowingly manufactures and controls substance. I'm sorry? Intentionally or knowingly. And he did. I'm sorry? Your client did intentionally and knowingly manufacture marijuana, according to the... That's what the jury found. Subsection B says penalties if the offense involved 1,000 kilos or more than 10 or 20-year mandatory minimum. And the jury found that there were more than 1,000. That's correct. But if... And the basis of the pre-Allene case law was that mens rea is irrelevant to the penalty provisions of Section 841B. That's from Gunter. You're just saying once it becomes an element, you've got to have a mental element. You cannot read the sections separately anymore. Where are you getting that law? Once it becomes an element of the offense, and there's no doubt that the more than 1,000 or more is now an element of the offense, where are you getting the law that ipso facto there must be a mental element proven? We don't, generally speaking, countenance. Because the other reading is simply inconsistent with the way we define crimes in this country. Do you have a case that you would cite? No, but I think this would be a good one. Well, you've got to have a general principle that once something is an element, the presumption is you've got to have a mental element to it. Now, there are some cases that say that, but you don't cite any of them. Well, the rule against, well, bad brief writing again, probably a victim of age discrimination, but the rule against strict liability offenses, the general concept that we don't send a person to prison for 20 years on the basis of strict liability, which is what you would do if you don't define a mens rea component of this element of the offense. Even the guidelines require more than the circuit precedent does, because you've got to find for it to be relevant conduct that it was reasonably foreseeable. It's just, it is not, in my view, a sensible way of construing the statute once we understand that these are not sentencing factors, these are not sentencing provisions, these are elements of the offense. Thank you. May it please the Court, Your Honor. Janet Parker for the United States. I'd submit to the Court that the, commend to the Court a reading of the District Court's careful decision in this case with regards to- I have a last point. Normally, if something does become an element of an offense, we don't, we normally say there is at least a presumption that there needs to be knowledge or intent to violate that element. I respectfully disagree, Your Honor. There are many, the mens rea requirement does not apply to every element of offenses. Two quick examples. FDIC proof of knowledge that a financial institution is FDIC insured is not required. Jurisdictional element. That's right. But in this case- Yes, it's true. There's case law that says if it's a jurisdictional element, you may not have to have knowledge of it. But this is not a jurisdictional element. This is a substantive element of the offense. Well, may I make three comments to that? First of all, Elaine in no way purported to address mens re requirement as to drug things. The statute says that the defendant knew the defendant was involved in this defense in Section 841A, but 841B says the defense involved, not that the defendant knew that the defense involved. And thirdly, Your Honor, Torres is the only case still that I can find addressing this issue raised post-Elaine. That case was decided post-Elaine, addressed Elaine, and came to the contrary conclusion. It said Elaine does not alter, as long as the jury made the requisite findings, as to drug quantities to trigger the minimum and maximum. Making a difference if his intent was to grow five plants or not. He never said that. In fact, the record shows quite the contrary. What you're saying is that's irrelevant here. I'm saying that alternatively, in the alternative, the evidence, the record, shows that the defendant knew that the offense involved well more than 1,000 plants. But even if... He didn't know they were supposed to have to find that. As to the instructional element, that's correct. He's saying that the record proves that he did know it. And I would say it... I didn't interrupt, Your Honor. I'm sorry. But there's no instruction to the jury that they have to find that, so he couldn't contest that. Well, I think, Your Honor, if you look at the closing arguments, the closing arguments, the government said, in fact, he knew, but you don't have to decide that issue. The defense argued that he knew of five plants. Let me ask you a question on a completely different subject. Attorney General Holder was, before the judicial conference this week, talking about the fact that the Department of Justice was trying to implement these speeches that he's been making about how unfair many of the drug laws are, crack cocaine, etc. Here, we've got a nonviolent marijuana grower in a situation now where many states are growing marijuana and we're saying that's okay, and he gets 20 years? Well, Your Honor, I think, first of all... Do you think that's fair? Your Honor, I think that's the law. Now, he's not a nonviolent person. If you address the record here, it shows he, in fact, was assessed points on his guideline score for threatening and intimidating witnesses. Mr. Dado is not a nonviolent person, and while it was not emphasized during the course of the trial, contrary to suggestions of defense counsel, he did have access to a loaded firearm at his store, which was a liquor store. That's not an uncommon place, but it is uncommon for liquor stores, I submit, also to have scales matching the type of scales that the co-defendant who is involved in manufacturing possesses, and also... You think that he should get 20 years? Your Honor, I'm not here to address policy. I'm here to address what is the law. That's the law. If the law changes, we've had to deal with it. The Department of Justice's policy, according to the Attorney General, is changing, but you haven't gotten any word of that, I take it. I know that there are changes in the wind, and I know that we went through this before with crack cocaine, but we're not to a point where that should impact the decision in this case. But nothing is said to the United States Attorney's offices or to Assistant United States Attorneys that this policy of these long drug sentences is now subject to change. I have not received anything that said that in a case that's already been sentenced and is on appeal, it's a charging decision going forward. That is what instructions we have had. No instructions altering this position as to this case or similar situation. President Kennedy used to say when he was President that get his advisors together, and they would change a policy for the better. And he would publish that, and nothing would happen. And it seems to me that's pretty much what we're doing with regard to these drug crimes. We've got to change a policy, which the Attorney General is talking about, the Department of Justice. I mean, it's ridiculous to me, so this has got to get 20 years. Your Honor, I'm not here to debate the wisdom of— But we're here to do justice. Yes, Your Honor, I believe that. But that is not within my authority to amend the statute, and I'm not seeking one way or another to implicate that. And I don't think whatever the court feels about sentencing in this case should have anything to do with the fact that this person was correctly convicted and duly sentenced under the law. He is a repeat offender, too, I would add. The reason he got 20 years wasn't just because of 1,000— One part marijuana conviction, right? Yes, and he's involved in a very large-scale operation. This is not anything like a medical marijuana case or something where state law condoned this. This investigation was initiated by the state police, and this is not legal under Michigan law. 20 years? Your Honor, I have defendants who are serving life sentences for marijuana, but that's not the issue before the court in this case. I don't involve—I'm not involved in creating a statutory scheme. You are enforcing it, and maybe the way you charge could be changed so that you get a little—you know, this guy maybe ought to get 3 or 4 years at the most. He was charged in May of 2012—excuse me, 2011. The trial was in May of 2012. Holder's comments were in 2013. That makes all the difference. Well, I'm sorry, Judge, that's the way it is. If I may return to any other issues, first of all, I would like to comment on the allegation that Mr. Abbott's testimony was absolutely critical. If you look, Mr. Abbott's direct testimony was 16 pages in a transcript where the trial testimony was approximately 650 pages. By my count, slightly over 650 pages. Sixteen pages on direct. The cross-examination of him was 25 pages by my count. So the direct exam was about 2.5% of the total trial. It is not true, nor is it critical, that he was the only person who had direct contact with Mr. Dado. It's not true in any means because we know that Mr. Schweikert, Eric Schweikert, was directed by Mr. Dado after the discovery of the GROW operation. He, that is Mr. Schweikert, was directed by Dado to go back out, harvest the marijuana that had been missed by the search, process it, give it to Mr. Dado, who then sold it, gave part of the money to Mr. Schweikert, and then took that money back and used it to secure a retained attorney for Michael Zimaitis. Mr. Zimaitis had direct contact with Mr. Dado, and the fact that not everybody spoke directly to Mr. Dado doesn't mean that there wasn't communication as part of the conspiracy. In fact, Mr. Corlew, Mrs. Corlew, Mr. Schweikert, and Mr. Abbott all testified consistently as to Mr. Dado's role in the conspiracy, and indeed as to this, except for Mrs. Corlew, as to this transaction, where even after the search has led to the discovery of the main GROW operation, Mr. Dado continued to exercise control over the organization and to direct its activities and to handle finances on behalf of the organization and people who were ensnared in the arrest. So Mr. Moran uses a modifier, personal contact. I don't submit that that's relevant in the picture here where you have a conspiracy. The record shows there was a long-standing drug-related, marijuana-related relationship between the Corlews, the Mightys, Abbott, and Mr. Dado, and as to this conspiracy, there was ample evidence that both Mr. Schweikert and Mr. Dado had. There was evidence, though, that the district court found was improperly not turned over. That is correct. And let me just explain, if I may. The memorandum wasn't prepared until after the trial. It was prepared in response to the motion for a new trial. Mr. Derosier, who was the case agent, had interviewed Mr. Abbott more than a year before Dado was charged, and in that discussion, interview, at Mr. Zyrka's office, there was no reference to Mr. Dado. And as Mr. Derosier explained, he wouldn't have put out the name Mr. Dado because Mr. Dado was under investigation. The information Mr. Abbott provided at that time related to Brandon's Mightys. He was never charged, and it was just something that didn't, it wasn't a trail of information that Mr. Derosier followed up on, even to the point of writing a report, because it just wasn't anything that productive. Now, as to the arson, I would submit that the court correctly found there was nothing to disclose because, in fact, the record shows that all the information indicating that there was an arson was corroborated. Though the marshal couldn't find the file of the arson, the fire marshal, when interviewed by Agent Derosier, recalled that, yes, indeed, there had been a fire of that nature in some place, but he just couldn't find the file. And the defense had the opportunity to call the fire marshal and say that that was not true at the motion hearing, but that was not done. Now, the other two things had to do with supposedly a claim by Mr. Abbott that he had sought immunity or the fact that he was seeking immunity from the federal government. First of all, he was never charged. He was never a target of a federal investigation. He was charged in state court. The defense knew that, and, in fact, they produced for trial and used in cross-exam a dismissal of one of his state cases. So they were aware of that and not disarmed for it. The court—I'm sorry. So someone like Abbott could not be charged in federal court as a result of his being cooperative with federal agents. In this case, that would not have happened because we had no evidence of his involvement. His testimony was Mr. Dado sought to recruit him for this operation, but he decided that he didn't think there was any way you could grow 3,000-plus plants outdoors and not have somebody discover them, so he declined to involve himself in the conspiracy. So as to this case, he was not chargeable. He had state charges pending, yes, but there was nothing as to this case for which he was even chargeable. In the abstract, in another case, someone can get immunity in exchange for cooperation, but that was not Mr. Abbott's circumstance. And I submit that the court's analysis is very careful and correct as to the impact of Mr. Abbott's testimony. His testimony was corroborated and really totally consistent with that of Mr. Corlew, Mrs. Corlew, Mr. Schweiker, and it was in the aggregate. I'm not saying it was insignificant. It wasn't, but it wasn't the key testimony that Mr. Dado would have the court believe. As I've already indicated, by my estimation, it was about 2.5 percent of the overall volume of testimony presented at trial. Yeah, but of course the percentage is not key. It's what is the content. Yes, and the content was consistent with what others had said and consistent with the proofs, even Mr. Anderson, that Mr. Dado was a person who owned a liquor store, he was financing the operation, that he was going to take the bulk of the marijuana and sell it at $3,000 a pound. All of that same information came from other people. It was another person from outside of the conspiracy testifying as to Mr. Dado's recruitment efforts, trying to bring him into the conspiracy. I don't know if it's in my brief, but it's in the record that I believe Mr. Hebbett was a plumber. He had a job, unlike all the other members of the conspiracy, except for Mr. Dado. Mr. Dado was a person who had a business and had a source of revenue. Mr. Corlew, Mr. Zumaides, all those people were unemployed except for working for the organization to produce the marijuana. No, I take it back. Mr. Stover had a job, too, but he was a bit player who only was there to process the marijuana at the end. With regards to the instructional issues... Your red light is on. Oh, I'm sorry, Your Honor. Okay, if you want to rely on your brief, that would be fine. Yes, Your Honor, I would be glad to do that. Thank you. Thank you. Thank you. Going from back to front, John Abbott was called as the prosecution's last witness. He got on the witness stand, said, I am Solid Dado's best friend. He's asked, Are you comfortable being here? No, I feel terrible about this. The impression seeming to be that he just was doing what he had to do. Now, it's true that other people had said that Michael Zimides had told them that Sal was involved. Michael Zimides didn't testify, wasn't called by either side. But the testimony was also that Zimides had a motive to claim that he had a well-to-do partner because Zimides was broke. And people, the Corlews testified, Rocky Corlew testified on cross-examination that he would have been very reluctant to go into business with Michael Zimides based on what he understood about Michael Zimides' finances. So all of this co-conspirator stuff, sure it was consistent, but it didn't have a whole lot of force until his best friend, Sal's best friend, got on the witness stand and tearfully told them what he said he knew. As to the arson allegation, as I recall the testimony and as I reported in my brief, the investigator did not say that the fire marshal told them there had been a fire. What the fire marshal told him, as I recall the testimony, was that there had been an arson complaint, but that he couldn't find anything to back it up. That's what I understand. So there was no evidence that suggests there was a fire. There was only evidence that suggests there was not. Going to the sentencing issue, there is the evidence of Mr. Dato's knowledge of what the offense involved, the element that we're talking about, was really quite seriously contradicted. The only testimony of his actual involvement with marijuana was that he had taken perhaps five and a half pounds during the Gro operation and one or two pounds afterwards. The testimony from Abbott was to the effect that Mr. Dato had advanced, loaned or given or invested $3,000 with Mr. Zimites. $3,000 as against what would have been several million dollars worth of marijuana is hardly conclusively or even convincingly suggests that Mr. Dato would have had knowledge of the scope of what this marijuana operation involved. Mr. Abbott had two conversations, one with Zimites and one with Mr. Dato, and he tended to conflate them. His testimony clearly was that he had discussed a number of plants with Mr. Zimites, but as I say, he kind of was confusing the details of the conversations. And I know my red light is on. Page 55 of the original submission does suggest some authorities for the proposition that element equals mens rea. Thank you very much for your patience. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?